IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


WEBSTER BUSINESS CREDIT
CORPORATION                                              PLAINTIFF

        v.           Case No. 1:08-CV-1083

BRADLEY LUMBER COMPANY, et al.                         DEFENDANTS

ARKANSAS DEVELOPMENT FINANCE            INTERVENOR PLAINTIFF
AUTHORITY

        v.

WEBSTER BUSINESS CREDIT
CORPORATION, et al.                      INTERVENOR DEFENDANTS


                    MEMORANDUM OPINION AND ORDER

        Before the Court are two reports and recommendations of the
Honorable Barry A. Bryant, United States Magistrate Judge for the
Western District of Arkansas, filed on June 17, 2011.  The first
(Doc. 233) concerns Plaintiff Webster Business Credit Corporation's
("Webster") Motion for Partial Summary Judgment and Dismissal of
Counterclaim and Defenses (Doc. 121), and the second (Doc. 234)
concerns Plaintiff's Motion to Dismiss Amended Counterclaims and
Defenses (Doc. 210).

        The Court notified the parties in an order of August 22, 2011
(Doc. 243) that it would treat Plaintiff's Motion to Dismiss (Doc.
210) as a Motion for Summary Judgment pursuant to Rule 56.  The
parties briefed the issues raised in Plaintiff's pending Motions
(Docs. 121 and 210), participated in a hearing before the

Magistrate on January 31, 2011, submitted written objections to the Magistrate's reports and recommendations (Docs. 235, 237, and 240), and submitted additional evidence outside the pleadings (Docs. 245-47 and 251) pursuant to the Court's request as specified in its Order of August 22, 2011 (Doc. 243).

The Court has reviewed this case *de novo* and, being well and sufficiently advised, finds as follows:

First, the report and recommendation of the Magistrate, filed June 17, 2011 (Doc. 233), regarding Plaintiff's Motion for Partial Summary Judgment and Dismissal of Counterclaim and Defenses (Doc. 121) is proper and should be and hereby is adopted in its entirety. Accordingly, Plaintiff's Motion for Summary Judgment and Dismissal of Counterclaim and Defenses (Doc. 121) is **GRANTED IN PART** with regard to summary judgment of Counts I-IV of the Complaint and **DENIED AS MOOT** with regard to dismissal of Defendants' Counterclaim and Defenses.  Counts I-IV of the Complaint are therefore dismissed with prejudice, and Plaintiff shall collect the amount of $2,888,307.72 from Defendant Bradley Lumber Company ("Bradley"), said amount being due pursuant to the Webster loan as of September 22, 2008, exclusive of additional interest and fees.  Plaintiff is also entitled to recover all costs and expenses of collection, including its reasonable attorneys' fees incurred on behalf of Plaintiff.

Second, the Court declines to adopt the report and

2

recommendation of the Magistrate filed June 17, 2011 (Doc. 234), regarding Plaintiff's Motion to Dismiss Defendants' Amended Counterclaims and Defenses (Doc. 210).  After *de novo* review and *sua sponte* conversion of Plaintiff's Motion to Dismiss (Doc. 210) into a Motion for Summary Judgment, the Court finds that Plaintiff's Motion (Doc. 210) is **GRANTED IN PART AND DENIED IN PART**.

## I.   Background

Webster commenced this action against Bradley and Bradley's various affiliates, including Bradley's owner and president, Dr. F. David Chambers ("Chambers"), by filing its Complaint on October 17, 2008 (Doc. 1).  According to the Complaint, on or about October 30, 2006, Webster, a New York based commercial lender, entered into a Credit Agreement with Bradley, a hardwood mill based in Warren, Arkansas, that buys, harvests, and converts oak and pine logs into various wood products.  Webster agreed to provide Bradley working capital and additional financing needs on a going-forward and revolving basis up to six million dollars ($6,000,000).

Bradley delivered to Webster a secured promissory note for the $6,000,000 loan, and in exchange Bradley granted Webster a security interest and lien on all of Bradley's assets, including Bradley's inventory, equipment, receivables, securities, and leasehold interests.  On a weekly basis, Bradley was obligated to provide Webster certificates and reports setting forth the amount and

3

location of the collateral, including the lumber inventory and receivables.  Chambers, the principal of Bradley, also pledged additional collateral security for the Webster loan by personally guaranteeing all obligations of Bradley to Webster.

The Court determined, as per the Magistrate's report and recommendation (Doc. 233) which was adopted in the instant Order, that Bradley defaulted under the credit agreement with Webster, and Webster is entitled to summary judgment on its breach of contract claims as outlined in the Complaint (Doc. 1) at Counts I-IV.[1] Previously, the Court granted Webster a preliminary injunction (Doc. 26) prohibiting Webster from dissipating, using, transferring, selling, moving, or otherwise interfering with the collateral as defined in the credit agreement and all the lumber and assets at any of the Defendants' facilities.  The Court also appointed a Special Master to investigate the whereabouts and disposition of certain missing pine and log inventory and any alleged fraudulent transfers or conveyances by Bradley to any other entity.

While Bradley and the other Defendants do not contest the amounts due under the loan agreement, nor that the indebtedness was accelerated by the terms of the agreement, they assert counterclaims and defenses against Webster.  The sufficiency of

---

[1]    Counts V-VIII of Webster's Complaint remain for trial.

4

Defendants' counterclaims and defenses are addressed herein using the summary judgment standard of review.

## II.  <u>Standard of Review</u>

In determining whether summary judgment is appropriate, the moving party bears the burden of establishing both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).  The Court must review the facts in a light most favorable to the party opposing a motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts.  *Canada v. Union Elec. Co.,* 135 F.3d 1211, 1212-13 (8th Cir. 1998) *(*citing *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir. 1983)*.*  In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule

5

56, must set forth specific facts showing that there is a genuine issue for trial. *Ghane v. West,* 148 F.3d 979, 981 (8th Cir. 1998)(citing *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981)). Furthermore, "[w]here the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996)(quoting *Crain v. Bd. of Police Comm'rs,* 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

## III. **Discussion of Counterclaims**

In their Amended Counterclaims (Doc. 141), Defendants (hereinafter "Bradley") plead causes of action based on (1) breach of contract; (2) violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"); (3) fraud in the inducement; (4) conversion; (5) promissory estoppel; and (6) commercial unreasonableness. The Court will address each cause of action in turn.

### A. **Breach of Contract**

Bradley maintains that it was Webster, rather than Bradley, that first breached the credit agreement. Bradley states that it "fully complied with the terms of the Credit Agreement and the parties' course of dealings at all times prior to Webster's breach of the agreement, or their performance was excused by Webster's conduct." Doc. 141, ¶ 28.

Specifically, Bradley alleges that "Webster arbitrarily and

6

unilaterally terminated funding" when Webster suddenly began enforcing a provision of the agreement known as the "concentration cap." *See* Doc. 1-2, pp. 4-5. The "concentration cap" provision specified that Webster would refuse funding under the loan agreement for any Bradley accounts that exceeded 10% of Bradley's total accounts receivable. Bradley asserts that from October 30, 2006 through September 30, 2007, Webster "made a knowing and conscious decision" to waive the 10% concentration cap provision and fund the top three Bradley account debtors comprising 62.7% of Bradley's total accounts receivable. Doc. 141, ¶ 11. According to Bradley, after September 30, 2007, "Webster arbitrarily and unilaterally decided to raise the 10% issue, and refuse funding in accordance with the parties agreement . . ." *Id.* at ¶ 12. After Webster began "disallowing large mat customers as eligible receivables under the line of credit, [Bradley] was unable to procure the necessary hardwood logs during the end of the 2007 hardwood logging season . . . and [Bradley] had already been mortally wounded by Webster's wrongful conduct." *Id.* at ¶ 13.

Bradley contends that Webster knowingly waived a certain provision of the contract through a course of dealing, and in doing so caused Bradley to rely on the waiver to Bradley's detriment. Bradley ignores that the express language of its credit agreement with Webster states that any waiver, modification, or amendment of the agreement cannot be established through a course of conduct and

7

must be specified in writing signed by an officer of Webster. Doc. 1-2, p. 13. Section 16.2 of the contract states explicitly: "Neither this Agreement nor any Other Document nor any portion or provisions hereof or thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement or any Other Document." *Id.*

Considering this provision of the agreement between the parties, which was unambiguous in its construction and fully negotiated by counsel on both sides, any allegations by Bradley of pre-contractual oral agreement, post-contractual oral agreement, waiver by Webster, or course of dealing by Webster would require a written modification to the contract, which both parties agree did not occur here. New York law, which governs the contract, routinely upholds provisions such as are present in the contract in the case at bar. *See, e.g., Friedman v. Ocean Dreams, LLC*, 56 A.D.3d 719, 720 (N.Y. App. Div. 2d Dep't 2008)(affirming trial court's dismissal of claims based upon clear and unambiguous language of the contract, including a "no modification clause");

8

*Manufacturer's Hanover Trust v. Trans Nat'l Comm., Inc.*, 36 A.D. 2d 709, 710 (N.Y. App. Div. 1st Dep't 1971)(holding that respondents may not avoid their obligation to lender by claiming oral representation by lender not to enforce the written guarantee according to its terms).

Moreover, Bradley cannot excuse its lack of compliance with the terms of the contract by claiming lack of knowledge of the contract's terms. *See Rader v. Mfrs. Cas. Ins. Co.*, 139 N.Y.S.2d 388, 390 (Sup. Ct. N.Y. Cty. 1955) ("But business could not be transacted with any feeling of confidence or security at all if written contracts, signed without trick or device or misrepresentation or breach of duty, could be either rescinded or reformed merely because the party signing did not read the document before signing it or did not realize the full legal effect of it"). Various exhibits evidence that Bradley's attorney reviewed several versions of the negotiated agreement on behalf of Bradley.  Doc. 247, Exhs. 26-28.  Moreover, Defendants admit that they specifically requested that Webster waive or modify the concentration reserve, but Webster refused to do so (Doc. 247, Exh. 4, pp. 239-40).  The only written modification to the credit agreement, which was executed by the parties in July 2007, made clear that all other terms of the agreement were ratified, and the sole provision that was altered was one related to monitoring Bradley's cash flow (Doc. 124-18).

Finally, Section 13.2 of the contract states that "[n]o delay or omission on Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option of any default." Doc. 1-2, p. 10. Accordingly, though the parties agree that Webster did not strictly begin enforcing the 10% concentration cap until September 2007, once enforcement began, Bradley began complying with the contract's reporting requirements and received in excess of $4.6 million from Webster from October 2007 through April 2008. *See* Doc. 124-8, pp. 9-13; *cf. Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991)("It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach"). These cash advances by Webster continued until Bradley became admittedly overadvanced under the borrowing formula and breached the contract with Webster (Doc. 6, p. 3).[2] Clearly, the breach of contract was caused by Bradley, not Webster, and no genuine issue of material

---

[2] Bradley became overadvanced on the loan from Webster in April 2008, when it admitted to overstating the value of its inventory in the reports it submitted to Webster to support its advances and outstanding loan balance. Doc. 247, Exhs. 4, p. 305; 6, pp. 204-05; 8A, p. 174; 63; 82. Bradley's accountants confirmed the overstatement, and Bradley had no availability under the credit agreement until it could generate sales. The evidence shows that Bradley's overadvancement and breach of contract in 2008 were not caused by the concentration cap issue, but by a discrepancy in the calculation of Bradley's inventory.

10

fact remains precluding summary judgment on this claim.[3]
Therefore, Bradley's counterclaim based on breach of contract is
dismissed with prejudice.

**B.   Arkansas Deceptive Trade Practices Act**

Bradley alleges that Webster improperly manipulated the terms
and conditions of the parties' agreement concerning the so-called
Syringa receivable and jeopardized Bradley's lending relationship
with Simmons First National Bank, Bradley's lender prior to
Webster. Bradley maintains that Webster's acts in relation to the
Syringa receivable and Simmons Bank were unconscionable, false, or
deceptive pursuant to the Arkansas Deceptive Trade Practices Act
("ADTPA").

Webster agrees that the Syringa receivable was pledged as
collateral for Webster's loan. Although Chambers claims that
Webster made an oral promise to pay the Syringa receivable directly
to Simmons Bank rather than apply the payment to the Webster loan,
the deposition testimony of Pat Anderson, the Senior Vice President
at Simmons Bank, confirms that there was no agreement in writing
concerning Syringa and Simmons Bank. Doc. 247, Exh. 1, pp. 124,

---

[3]   To the extent that Bradley maintains Webster breached the
covenant of good faith and fair dealing when Webster required
Bradley to comply with the credit agreement's concentration cap,
this argument is without merit. When an alleged breach of the
covenant of good faith and fair dealing consists of a party merely
exercising its contractual rights, such a claim fails as a matter
of law. *Citadel Equity Fund, Ltd. v. Aquila, Inc.*, 371 F.Supp.2d
510 (S.D.N.Y. 2005) (rejecting breach of duty of good faith claim
when lender acted in accord with the terms of the loan document).

165.  Further, Mr. Anderson testified that if Simmons Bank had a written agreement with Webster concerning the Syringa receivable, it would have contacted Webster regarding this.  *Id.* at p. 167. Bradley's financial officer, Cris Krost-Bolin sent e-mails to Webster asking that Syringa distributions be applied to the Webster loan, not to Simmons Bank.  Doc. 247, Exhs. 32-34.  Finally, Ms. Krost-Bolin testified that she had no personal knowledge of any agreement concerning the Syringa receivable and conceded that she had never seen any writing outlining such an agreement.  Doc. 247, Exh. 2, p. 290.  It is therefore clear to the Court that no genuine issue of material fact exists regarding Webster's treatment of the Syringa receivable as somehow violative of the ADTPA, and this claim is accordingly dismissed with prejudice.

### C.   Fraud in the Inducement

Bradley maintains that Webster induced it to enter into the credit agreement, knowing that Webster's conduct would probably result in damages.  According to Bradley, Webster made a variety of fraudulent oral promises, and had Bradley not relied on those promises, Bradley would have kept its loan at Simmons Bank and not transferred its lending relationship to Webster (Doc. 141, ¶¶ 3-4). Also, Bradley complains that the New York choice-of-law provision in the credit agreement should be considered "void, in addition to the Credit Agreement itself" because Webster fraudulently induced Bradley to enter into an agreement with such a provision. Doc. 141, ¶ 37.

12

Bradley's claim for fraud in the inducement appears to be that if Bradley had known Webster would adhere to the written provisions of the credit agreement, Bradley would never have entered into the agreement, and thus Bradley would not have defaulted on the loan. The Court has established that the credit agreement was a valid contract entered into through the negotiations of attorneys on behalf of both parties, and the written terms of the agreement were known to the parties. No course of dealing or waiver existed to alter the written terms of the agreement. There is no evidence before the Court to show that Bradley entered into the agreement under duress. On the contrary, the evidence reflects that Bradley considered it to have a positive working relationship with Webster up until the time Bradley defaulted on the loan and became overextended in the borrowing formula. Any oral promises alleged by Bradley are void under the explicit terms of the credit agreement.

Moreover, as discussed above, Webster advanced Bradley more than $4.6 million after enforcing the 10% concentration cap on receivables that Bradley found so objectionable. A claim for fraudulent inducement under New York law requires that there be a misrepresentation of material fact which the lender knew to be false and upon which the lender intended the borrower to rely. Further, there must be evidence that the borrower relied on the misrepresentation and suffered injury because of this reliance. *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). Bradley's

fraudulent inducement argument is undercut by the fact that Bradley
continued to collect millions of dollars from Webster in advances
under the loan agreement, even after Webster began enforcing the
provision of the loan Bradley contends was misrepresented to
Bradley.  Bradley did not elect to rescind the loan when it became
clear that the 10% concentration cap would be enforced; if Bradley
were fraudulently induced into entering into the credit agreement
by relying on Webster to waive the concentration cap, rescission of
the contract may have been appropriate.  Instead, Bradley continued
to accept the benefits that flowed to it under the credit agreement
and, when it could not meet its obligations to Webster and became
overadvanced, only then complained of fraudulent inducement.

Accordingly, the claim for fraud in the inducement lacks
validity in fact and in law and therefore is dismissed with
prejudice.

### D.  Conversion

Bradley asserts that Chambers personally deposited funds into
the Webster account related to COBRA payments for Bradley's
employees, and notwithstanding a demand for release of the funds,
Webster refused to release them.  Bradley has stated confusingly
that the alleged COBRA funds "were not [Bradley's] funds, nor
Webster's" (Doc. 141, p. 5) yet Bradley argues now that Webster is
obligated to release these funds to Bradley.  Bradley has submitted
no evidence to substantiate its claim that it made a request to
Webster for the release of the funds; Webster for its part

14

vehemently disputes that any such request was made.  Regardless, under the plain language of the credit agreement, any funds deposited in Webster's lock-box account are the property of Webster and are to be applied against the loan balance.  Doc. 1-1, p. 13. As no genuine issue of material fact exists with regard to the claim for conversion, it is dismissed with prejudice.

    **E.   Promissory Estoppel**

Bradley's claim for promissory estoppel is that "Webster's conduct and representations indeed induced such reliance by Counter-Plaintiffs, causing it to formulate business decisions based upon the conduct and representations of Webster, such as changing its primary finance source, and mortgaging related property."  Doc. 141, pp. 15-16.

The Court has determined above that any reliance by Bradley upon alleged pre-contractual oral promises made by Webster were not binding, as the written contract between the parties controlled, and any alleged oral promises were never reduced to writing.

Furthermore, Bradley's assertion that it was damaged by virtue of having to change "its primary finance source" appears to refer to Bradley's decision to switch its loan from Simmons Bank to Webster when it entered into a borrower/lender agreement with Webster in 2006.  The facts show that Bradley's previous lender, Simmons Bank, froze Bradley's line of credit before Bradley entered into the credit agreement with Webster (*see* Doc. 247, Exhs. 1, p. 201; 13; 14 (discussing Simmons Bank's need to develop "exit

strategies" to withdraw from its lending relationship with Bradley)).  Bradley was compelled to find a lender other than Simmons, and Bradley did so in contracting with Webster.  Bradley's promissory estoppel claim is consequently without merit and is dismissed with prejudice.

### F.   Commercial Unreasonableness

Bradley alleges that Webster breached its duty of commercial reasonableness both before and after Webster acquired possession of Bradley's collateral under the credit agreement.  After Bradley defaulted under the terms of the credit agreement, Bradley alleges it was harmed when Webster placed tags on lumber inventory stored at the sawmill facility indicating that such inventory was subject to Webster's security interest.  Bradley claims it was difficult to sell the lumber with Webster's tags on it.  In addition, Bradley claims that Webster instructed Bradley to sell the collateral "at any price," which resulted in Bradley selling the collateral at a loss.

The record reflects that on December 18, 2008, the Court entered an order (Doc. 26) which stated that under the terms of the parties' credit agreement, Webster had the right to take possession of the collateral, foreclose on the collateral, and sell any or all of the collateral, as well as enter Bradley's premises to accomplish the liquidation of the collateral.  At the time of the Court's Order, Webster had provided an inventory of collateral to the Court reporting a $2.8 million shortfall.

Webster asks for summary judgment on the pre-possession allegations only, and thus any allegation that Webster acted commercially unreasonably with regard to Bradley's collateral after Webster took possession is an issue that is preserved for trial.

With regard to the pre-possession allegations, the law is clear that there is no duty on the part of a lender to act commercially reasonably until the lender comes into actual possession of the collateral. *See Chase Equipment Leasing Inc. V. Architectural Air, L.L.C.*, 922 N.Y.S.2d 69, 70 (N.Y. App. Div. 1 Dept 2011)(no duty to act commercially reasonably under New York Uniform Commercial Code § 9-207 until the creditor comes into possession of the collateral as a matter of law); *Bank Leumi USA v. Agati*, 5 A.D.3d 292, 293 (N.Y. App. Div. 1 Dept 2004).

Furthermore, the credit agreement between the parties expressly allowed Webster to mark inventory that was subject to its liens following a default (Doc. 1-2, § 12.1). This constitutes a second independent justification for Webster's conduct and thus cannot form the basis of a commercial reasonableness claim prior to Webster's possession of the collateral. Accordingly, this claim with regard to the commercial reasonableness of Webster before it took possession of the loan collateral is dismissed with prejudice.

**IV.   <u>Conclusion</u>**

The Court adopts in its entirety the report and recommendation of the Magistrate, filed June 17, 2011 (Doc. 233), regarding Plaintiff's Motion for Partial Summary Judgment and Dismissal of

Counterclaim and Defenses (Doc. 121).  Accordingly, Plaintiff's Motion for Summary Judgment and Dismissal of Counterclaim and Defenses (Doc. 121) is **GRANTED IN PART** with regard to summary judgment of Counts I-IV of the Complaint and **DENIED AS MOOT** with regard to dismissal of Defendants' Counterclaim and Defenses. Counts I-IV of the Complaint are therefore dismissed with prejudice, and Plaintiff shall collect the amount of $2,888,307.72 from Defendants, such amount being due pursuant to the Webster loan as of September 22, 2008, exclusive of additional interest, fees, and other expenses.  Plaintiff is also entitled to recover all costs and expenses of collection, including its reasonable attorneys' fees incurred on behalf of Plaintiff.

The Court declines to adopt the report and recommendation of the Magistrate filed June 17, 2011 (Doc. 234), regarding Plaintiff's Motion to Dismiss Defendants' Amended Counterclaims and Defenses (Doc. 210).  After *de novo* review and *sua sponte* conversion of Plaintiff's Motion to Dismiss (Doc. 210) into a Motion for Summary Judgment, the Court finds that Plaintiff's Motion (Doc. 210) is **GRANTED IN PART AND DENIED IN PART.**  All counterclaims and defenses set forth by Defendants are dismissed with prejudice except the claim for commercial unreasonableness, which is preserved only with regard to actions Webster took after Webster took possession of Defendants' collateral.

18

**IT IS SO ORDERED** this 29th day of November, 2011.

/s/ Robert T. Dawson
Honorable Robert T. Dawson
United States District Judge